*Un* Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

**United States Courts
Southern District of Texas
ENTERED**

JUL 0 6 ENTD

**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| Delma Pallares, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION H-05-3018 |
| | § | |
| SAMIR ITANI, SUZANNE ITANI, ZIAD | § | FILED IN CAMERA AND |
| ITANI, AMERICAN GROCERS, LTD., | § | UNDER SEAL |
| ITANI FAMILY MANAGEMENT TRUST, | § | |
| AMERICAN GROCERS, INC., | § | |
| INTERNATIONAL GROCERS, INC., | § | |
| S&S ITANI, INC., and ITANI | § | |
| FAMILY LIMITED PARTNERSHIP, | § | |
| | § | |
| | § | |
| Defendants. | § | |

### SEALED OPINION AND ORDER

Pending before the Court in the above referenced action, brought under the *qui tam* provisions[1] of the Fair Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, to recover damages and civil penalties arising from Defendants Samir Itani, *et al.*'s submission of false claims for payment or approval by the United States, is Relator Delma Pallares' motion for award (instrument #69) from the settlement of the suit between the United States ("the Government") and Defendants. At issue is the amount of the Relator's statutory

---

[1] "*Qui tam*" is an abbreviation for the Latin phrase, "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which translates as "one who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency of Natural Resources v. United States ex. rel. Stevens*, 529 U.S. 765, 769 n.1 (2000).



share of a proposed settlement between the United States and Defendants.

### Relevant Law

As amended, § 3729(a)(1) defines the substantive violations of the FCA and provides in relevant part that "any person who," *inter alia*,

> (A) knowingly[2] presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A),(B),(D),(E),(F), or (G); . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461) note; Public Law 104-410, plus 3 times the amount of damages which the Government sustains because of the act of that person.

Suit may be brought by the Attorney General (31 U.S.C. §

---

[2] The Fifth Circuit defines "knowing" and "knowingly" to mean that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *United States ex. rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009), *cert. denied sub nom. Lithium Power Technologies, Inc. v. United States ex rel. Longhi*, 130 S. Ct. 2092 (2010).

3730(a))[3] or by a private person (§ 3730(b)(1),[4] known as a relator.
Here *qui tam* Plaintiff/Relator Delma Pallares filed this suit under
seal on August 26, 2005.  Where a private person brings the *qui tam*
civil suit, a copy of the complaint and written disclosure of
substantially all material evidence and information that the person
possesses must be served on the government and filed *in camera,* and
the complaint must remain under seal for at least sixty days until
the court orders service on the defendants.   31 U.S.C. §
3730(b)(2).  The Government may extend that sixty-day period while
it evaluates whether to intervene and "proceed with the action"
under § 3730(b)(4)(A) or "decline[] to take over the action, in
which case the person bringing the action shall have the right to
conduct the action" pursuant to § 3730(b)(4)(B).  In the instant
action, as a result of the fraud disclosed by Relator, the
Government was able to establish probable cause to execute a search

---

[3] Section 3730(a) states,
**Responsibilities of the Attorney General.**--The Attorney
General diligently shall investigate a violation under
section 3729.   If the Attorney General finds that a
person has violated or is violating section 3729, the
Attorney General may bring a civil action under this
section against the person.

[4] Section 3730(b) provides,

**Actions by private persons.**-(1) A person may bring a
civil action for a violation of section 3729 for the
person and for the United States Government.  The action
shall be brought in the name of the Government.   The
action may be dismissed only if the court and the
Attorney General give written consent to the dismissal
and their reasons for consenting.

warrant for Defendant American Grocers's warehouse, discovered documents and business records that allowed the Government to prosecute Defendants criminally for bogus trucking charges and shelter invoices and to obtain a guilty plea from Itani, negotiated a settlement, and, after twenty extensions of the sixty-day period, to make an appearance in the *qui tam* action on June 10, 2010 through attorney of record John A. Kolar, from the Civil Division of the Department of Justice ("DOJ").   See Letter from U.S. Attorney, Southern District of Texas to John Kolar, DOJ, Ex. 1 to #76.

Where the Government elects to join and proceed with the *qui tam* action, the relator "shall receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action."[5]   31

---

[5] The percentage range for the relator's award varies with the situation.  Section 3730(d)(1) further provides, "Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation."  Section 3730(d)(2) states, "If the Government does not proceed with an action under this section, the person bringing the suit or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages.   The amount shall not be less than 25 percent and not more than 30

U.S.C. § 3730(d)(1).[6]  The fifteen percent minimum share generally is viewed as a "finder's fee," or "incentive compensation . . . paid to a relator 'even if that person does nothing more than file the action in federal court.'"  *United States ex. rel. Johnson-Pochardt  v. Rapid City Regional Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003), *citing United States ex rel. Alderson  v. Quorum Health Group, Inc.*, 171 F. Supp. 1323, 1331, 1332 n.29 (M.D. Fla. 2001)(quoting 132 Cong. Rec. H9832-03 (Oct. 7, 1986). Congress permitted greater awards for greater assistance to "'encourage assistance from the private citizenry that can make a significant impact on bolstering the Governments fraud enforcement

---

percent of the proceeds of the action or settlement and shall be paid out of such proceeds."

[6] It should be noted that in 1986 Congress amended the FCA to significantly increase the percentage of a relator's portion of the FCA recovery.  Before that time the relator's portion in a "standard" *qui tam* action was capped at ten percent of the recovery.  31 U.S.C.A. § 3730(c)(West 1983).  Congress decided to increase the award to encourage private citizens to assist the Government's efforts to fight fraud by coming forward with information that might otherwise remain unknown.  *United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001).  For a general history of *qui tam* actions see *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 774-78 (2000); James B. Helmer, Jr., *How Great is Thy Bounty: Relator's Share Calculations Pursuant to the False Claims Act*, 68 U. Cin. L. Rev. 737 (Spring 2000).  Regarding the 1986 increase in the cap for the relator's share from 10% to from 15-30% where the *qui tam* suit is not based on publicly disclosed information, Helmer wrote that the increase was "to hold out the reward as an encouragement for qui tam suits to be brought.  Thus, a court would be most consistent with Congressional intent to set awards near or at the higher end of the range than the lower end."  68 U. Cin. L. Rev. at 757.

effort.'"  *Id., citing id.* at 1331 (quoting S. Rep. No. 990345 at
8(1986)).  "In those cases where the person carefully develops all
the facts and supporting documentation necessary to make the case
required by law, and where that person continues to play an active
and constructive role in the litigation that leads ultimately to a
successful recovery to the United States Treasury, the court should
award a percentage substantially above 15% and up to 25%"  *Id.,
citing id.* at 1332 & n.29 (citing 132 Cong. Rec. H9382-03 (Oct. 7,
1986)).  The 25% award is saved for relators who "'actively and
uniquely assist the government in the prosecution of the case.'"
*Id., quoting United States ex rel. Burr v. Blue Cross & Blue Shield
of Florida, Inc.*, 882 F. Supp. 166, 168 (M.D. Fla. 1995).  The
statute does not limit the maximum percentage of recovery to cases
that proceed to trial.  *See, e.g., United States ex rel. Fox v.
Northwest Nephrology Assoc.*, 87 F. Supp. 2d 1103, 1112 (E.D. Wash.
2000).  It is within the discretion of the court to determine the
actual percentage awarded.  *Id., citing Quorum Health*, 171 F. Supp.
2d at 1331 ("determination of the relator's share is left largely
to the Court's informed discretion), in turn *citing United States
ex rel. Merena v. Smithkline Beecham Corp.*, 52 F. Supp. 2d 420, 449
(E.D. Pa. 1998)("In the final analysis, [attempting to quantify in
a percentage the contribution of the relator] can be no more than
a judgment call by the decision maker.").

In passing the FCA, the Senate identified three factors ("the

Senate factors") to consider in deciding on the appropriate share to be awarded to the relator:   (1) the significance of the information contributed by the relator (including development of the   factual   information,   documentary   evidence,   and   legal arguments); (2) the relator's contribution to the final outcome; and (3) the government's prior knowledge of the information.[7] *Johnson-Ponchardt*, 252 F. Supp. 2d at 897-89, *citing Quorum Health*, 171 F. Supp. 2d at 1332-33 (*citing* S. Rep. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.A.A.N. 5266, 5293).

Another tool used by attorneys and courts for negotiating or determining an appropriate percentage award for the relator is a set of internal guidelines from the DOJ, employed to determine a potential increase or decrease in the percentage.   *Johnson-Ponchardt*, 252 F. Supp. 2d at 899-80, *citing Quorum Health*, 171 F. Supp. 2d at 1333 (noting the guidelines "touch many of the factors that common sense and experience commend in assessing a relator's contribution" and are "not exhaustive"), and *United States ex rel. Fox v. Northwest Nephrology Assoc.*, 87 F. Supp. 2d 1103, 1112 (E.D. Wash. 2000).   The factors applied to determine whether the percentage should be increased above 15% include   (1) prompt reporting of the fraud by the relator; (2) efforts of the relator

---

[7] *See United States ex rel. Fox v. Northwest Nephrology Assoc.*, 87 F. Supp. 2d 1103, 1112 (E.D. Wash. 2000)(relator's award increased because government did not previously know of defendants' illegal activity), *cited by Johnson-Pochardt*, 252 F. Supp. 2d at 899.

to stop the fraud or report it to a Government supervisor; (3) cessation of the fraudulent practices by the wrongdoer because of the *qui tam* filing; (4) warning the Government of a significant safety issue; (5) exposing a nationwide practice; (6) provision by the relator of extensive, first-hand details of the fraud to the Government; (7) the Government's lack of knowledge of the fraud; (8) substantial assistance by the relator during the investigation and/or pretrial phases of the case; (9) deposition of relator reflecting an excellent, credible witness; (10) substantial assistance from the relator's counsel to the Government; (11) support for and cooperation with the Government by the relator and her attorney during the entire proceeding; (12) resolution of the case by trial; (13) relatively small FCA recovery; and (14) substantial adverse impact on the relator caused by filing of the complaint. *Johnson-Ponchardt*, 252 F. Supp. 2d at 900 n.1. Factors weighed for a potential decrease in the percentage of the relator's award after an increase, but not dropping the share below 15%, include (1) participation by the relator in the fraud; (2) substantial delay by the relator in reporting the fraud or filing the complaint; (3) violation of the FCA procedures[8] by relator or her counsel; (4) mere suspicion or little knowledge of the fraud on

---

[8] *E.g.,* serving the complaint on the defendant or failing to file it under seal, publicity by the relator about the suit while it is under seal, and failure to provide the Government with a statement of material facts and evidence. *Johnson-Ponchardt*, 252 F. Supp. 2d at 900 n.2.

the part of the relator; (5) relator's knowledge based primarily on public information; (6) fraud discovered by the relator in the course of his Government employment; (7) prior knowledge of the fraud by the Government; (8) failure of the relator or her counsel to provide any help after filing the complaint, hampering the Government's endeavors to develop the case, or unreasonably opposing the Government's litigation position; (9) substantial effort required by the Government to develop the facts to win the lawsuit; (10) settlement of the case shortly after the complaint was filed or minimal need of discovery[9]; and (11) relatively large

---

[9] Courts are divided on the question of whether the case must go to trial for the relator to recover the maximum share, and the FCA is silent. *Johnson-Ponchardt*, 252 F. Supp. 2d at 903-04 (and cases cited therein). In *Northwest Nephrology*, 87 F. Supp. 2d at 1112, the court emphasized that the relevant concern is the significance of the relator's contribution, not how the case is resolved. In *United States ex rel. Pedicone v. Mazak Corp.*, 807 F. Supp. 1350, 1353 (S.D. Ohio 1992)("This Court does not find any support for the government's position that the *qui tam* Plaintiff's share should differ depending upon whether the case is settled or tried."), the court awarded the relator the maximum share when the case settled before trial. *See also United States ex. rel. Virgin Islands Housing Authority v. Coastal Genl Constr. Serv. Corp.*, 299 F. Supp. 2d 483 (D.V.I. 2004)(after successful criminal prosecution of defendants and applying collateral estoppel to establish liability in the *qui tam* civil case, finding relator "should receive maximum of 25% because it was the original source of the information and also spent a great deal of time and resources detecting and investigating the fraud"). Negotiations for settlement can be complicated and difficult; "[t]he exertion of the parties and their counsel [may be] scarcely less vigorous and combative than a trial of the same action." *Quorum Health*, 171 F. Supp. 2d at 1337. Other courts opine that the maximum recovery should be limited to cases in which the relator substantially assists the Government throughout discovery and trial. *See, e.g., United States v. Covington Tech. Co.*, No. CV-88-5807-JMI(BX), 1991 WL 643048 *1 (C.D. Cal. 1991)("In order to maintain incentive to

FCA recovery.[10]   *Johnson-Ponchardt*, 252 F. Supp. 2d at 900 n.2.
These guidelines are not regulations and are not binding on the
court.   *Id.* at 900, *citing Quorum Health*, 171 F. Supp. 2d at 1333.

Where the Government was unaware of the relator's information
and unlikely to discover the fraud on its own and the relator's
contribution is substantial and critical to the uncovering of the
fraud, the court may choose to reward the relator.   In *United
States ex rel. Johnson-Pochardt v. Rapid City Regional Hosp.*, 252
F. Supp. 2d 892 (D.S.D. 2003), the court found a relator was
entitled to 24% of $6.5 million in settlement proceeds in a *qui tam*
action against a hospital, physician, and his oncology practice for
subsidizing the doctor's oncology group with over one million
dollars by leasing space and services to the group for $19,000 when
they were valued at more than $136,000.   The fraud was previously
unknown to the Government and there was no evidence that it would

---

cooperate with the Government in False Claims Act cases generally,
the maximum recovery is reserved for those cases in which the
relators actively and uniquely aid the Government . . . . ");
*United States ex rel. Coughlin v. Int'l Bus. Machs.*, 992 F. Supp.
137, 142 (N.D.N.Y. 1998).

[10] One court has rejected the Department of Justice's guideline
that the size of the recovery is a significant factor, with a
larger recovering requiring a smaller portion for the relator.
*Merena*, 52 F. Supp. 2d at 450 (The FCA "provides for substantial
awards in order that persons who acquire first-hand knowledge of
false claims being presented to the Government will come forth and
file meritorious qui tam complaints.   The success of this
litigation in continuing to achieve its goals can only be assured
by unstintingly providing the qui tam awards dictated by Congress,
irrespective of the size of the awards.").

have discovered the wrongdoing had the relator not disclosed it.
The relator, as director of the Rapid City Regional Hospital Cancer
Care Institute, had personal knowledge of the fraudulent conduct,
spent hours reading and copying documents up to nearly ten years
old, helped the Government develop all the facts and build a case
by providing supporting documentation, analyzed the fair market
value of the lease arrangement and calculated the amount of the
subsidies, participated with her attorneys in settlement
negotiations resulting in a sizeable settlement, and continued to
play an active and constructive role throughout the litigation.
Other cases awarding a higher percentage to the relator where the
government had no knowledge and was unlikely to uncover the fraud
include *United States v. General Electric*, 808 F. Supp. 580, 582
(S.D. Ohio 1992)(Although the United States argued that the relator
had waited too long to disclose information unknown to the
Government that funds provided by the Government for projects
sought by the Israeli government were being diverted and embezzled
by an Israeli Air Force Colonel and a high ranking General Electric
official, the court awarded the relator 22.5% in recognition of the
FCA's policy to encourage disclosures of fraud to the Government),
*rev'd on other grounds*, 41 F.3d 1032 (6th Cir. 1994); *Quorum Health*,
171 F. Supp. 2d at 1333 (following settlement the court awarded 24%
of proceeds to relator for substantial contributions of relator and
counsel); *United States ex rel. Virgin Islands Housing Authority v.*

-11-

*Coastal General Const. Services Corp.*, 299 F. Supp. 2d 483, 490 (D.V.I. 2004)(finding relator was entitled to 25% of the proceeds of judgment because the relator was the original source of the information and he spent a great deal of time and resources detecting and investigating the fraud).

Courts have also considered any hardship to the relator in pursuing a *qui tam* action. *See, e.g., United States ex rel. Thornton v. Science Applications Intern. Corp.*, 79 F. Supp. 2d 655, 658-59 (N.D. Tex. 1998)(court may consider personal and professional hardships suffered by the relator in considering what percentage of the recovery the relator is entitled to), *vacated on other grounds*, 207 F.3d 769 (5th Cir. 2000); *Johnson-Ponchardt*, 252 F. Supp. 2d at 902 (in awarding a 24% share, the court took into consideration the fact that the *qui tam* suit "wreaked havoc" on relator's life:  she and her husband sold their business to ensure financial stability, her relationships with co-workers and her work environment deteriorated drastically, she lost a high paying job in a field that she loved and full health benefits, life insurance and retirement plan, positions on numerous boards and organizations); *Burr*, 882 F. Supp. at 169 ("A relator may be entitled to the statutory maximum percentage in situations where the relator has suffered personal or professional hardship."); *United States v. NEC Corp.*, 11 F.3d 136, 138-39 (11th Cir. 1993)(holding that part of the award's purpose is to "compensate the relator for the substantial

time and expense involved in bringing a quitam action")..

A successful relator in addition may recover reasonable expenses, attorneys' fees, and costs at the discretion of the court. § 3730(d)(1). *Longhi*, 575 F.3d at 475. All such expenses, fees and costs are awarded against the defendant. *Id.*, *citing* 31 U.S.C. § 3730(d)(1). If the relator was not successful on all claims, the Fifth Circuit turns to *Hensley v. Eckerhart*, 461 U.S. 424 (1983) for guidance. *Id.* In *Hensley*, the Supreme Court, reviewing an award of fees under the Civil Right Attorneys Fees Awards Act, stated that "'plaintiffs may be considered prevailing parties for attorney's fees if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in binging suit.'" *Id.* at 476, *quoting Hensley*, 461 U.S. at 433. Where the attorney has asserted different claims based on different facts and legal theories, generally an award of fees cannot be based on work on those proving unsuccessful; however, where a "'plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories,'" and "much of counsel's time is 'devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Id.* at 476, *quoting Hensley*, 461 U.S. at 435.

-13-

Under § 3730(c)(2)(B), "[t]he Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances."  Thus any settlement opposed by the Relator requires court approval following a fairness hearing and review of the relator's objections.

### Factual Background

The parties agree to the basic facts here.  Relator Delma Pallares, as the original source of the information, filed this *qui tam* action[11] under seal on August 26, 2005 after disclosing to the Government that Samir Itani, the owner and operator of American Grocers, Inc., was buying at substantial discount out-of-date or aging, and possibly contaminated, food products, erasing expired or soon-to-expire dates and forging new ones, and selling the food products to military contractors for consumption by American troops stationed in Iraq, Kuwait, and Saudi Arabia.  Pallares further alleged that Itani also forged numerous accompanying documents, including United States Department of Agriculture ("USDA") health certificates), foreign health and religious certificates, including

---

[11] Pallares filed a now controlling First Amended Complaint, adding Defendants, on June 10, 2009 and asserting that in addition to Itani's family members, all the entities were organized and operated as tools and business conduits of, and controlled by, Itani and functioned as his alter ego.

-14-

Halal certificates,[12] and invoices to permit customers to avoid foreign duties and tariffs.

Pallares was employed by Itani as a logistics manager and grocery manager at American Grocers from 1996 toJune 2003 and had personal knowledge of these activities. In addition to the FCA, Pallares claimed Defendants violated the Federal Food, Drug and Cosmetic Act and the Federal Meat Inspection Act.

After numerous interviews with Pallares, the Defense Criminal Investigative Service ("DCIS") and the Criminal Division of the United States Attorney's Office commenced an investigation and, with Pallares's continuing help, established probable cause to obtain a search warrant.    Federal agents raided American Grocers's warehouse in 2006, where they witnessed employees eradicating expired dates in various ways and discovered many documents which, again with Pallares' ongoing help, permitted the Government to indict in July 2007 and prosecute Itani for bogus trucking charges and inflated invoice prices ("shelter invoices") submitted to military contractors and ultimately to the Government by American Grocers.  During the last five years Pallares worked extensively with Michelle Zingaro, an Assistant United States Attorney for the Southern District of Texas, and John Kolar, an attorney with the Department of Justice.

---

[12] A Halal, an Islamic Slaughter Certification, certifies that products intended for importation into Muslim countries meet appropriate requirements for religious slaughter.

The Government has tentatively agreed to settle with Defendants for $13.2 million for the expired food charges, plus $1.8 million credit for sums paid to the United States Department of Defense by Public Warehousing Company, a/k/a PWC Logistics, n/k/a Agility Logistics ("PWC"). The parties agree that the damages are estimated to be significantly more than what American Grocers and Itani are being required to pay under the settlement. The expired-food-product single damages were estimated at $8.25 million based on documents Pallares located during her first interview, and the parties agree that if more documents were located, the damages could be significantly greater. The settlement also included damages for bogus trucking charges estimated at $2.3 million and for the "shelter" or inflated invoices, estimated at $1.5 million. The latter claims were not included in Relator's First Amended Complaint. The Government conducted a review of Defendants' financial situation and concluded they could pay more than the $13.2 million, but the DOJ stated it did not want to bankrupt American Grocers or Itani.

Assistant U.S. Attorney Michelle Zingaro, who worked extensively on the case with Pallares, after consulting with agents for DCIS who agreed with her, recommended that Pallares receive an award of 24% of the entire $13.2 million settlement, not just of the $8.25 million settlement amount relating to the stale, expired, and potentially contaminated food products that were alleged in the

*qui tam* complaint.

### Relator's Motion for Award (#70) and Reply (#76)

Emphasizing that potential damages here could amount to substantially more than the proposed settlement amount, Pallares's attorney, Joel Androphy, estimates that American Grocers sold approximately $50 million of food products to the United States military.    Counsel   for   Pallares   also   questions   the   DOJ's determination that Defendants are unable to pay more than $13.2 million without going into bankruptcy.[13]  Regarding the $3.8 million damages for bogus trucking charges and "shelter" invoices, he points out that the documents on which the charges were based were found only after and because the Government executed its search warrant, for which Pallares provided the information establishing probable cause.   Counsel argues that without Relator's lawsuit, there would have been no search warrant; indeed without the aid of Pallares, "the Government would have discovered no fraud at all, and American Grocers would have been free to continue selling its expired or near-expired food products, raising health risks and costing the Government money it does not have."    #69 at 4. Moreover, without the extensive time Pallares spent explaining and clarifying to investigators the contents of the documents found as

---

[13] Counsel argues that Itani has an expensive home in the Memorial area of Houston and several properties in Austin and is being permitted to continue his business despite the substantial fraud uncovered.

a result of the search, it is unlikely the Government would have
been able to prove the additional violations.  Her knowledge and
understanding of the various schemes were essential to the
Government's recovery of the settlement amount.  Furthermore, he
contends that since the Government usually settles with Defendant
for two times the amount of actual damages, the DOJ could have
required that the single damages of $8.25 million for the food
products be doubled to yield $16.5 million.  If not for the DOJ's
concern about not bankrupting Itani and American Grocers, the
entire settlement could be for at least $24.1 million ($16.5
million for the doubled altered-date claims and two times the $3.8
million for the bogus trucking charges and "shelter" invoices).
Mr. Androphy further states that the DOJ has admitted that the
value of Relator's claims for the expired food sales is at least
$16.5 million and that "it would be particularly unfair to reduce
her recovery in an 'ability-to-pay' settlement context because of
a criminal investigation for which she is responsible."  #69 at 4.
Counsel insists that Pallares should not be penalized because the
DOJ decided to keep American Grocers in business.

    Instead Relator's counsel argues for an award of 24% of the
$13.2 million settlement, or $3.168 million, because of Pallares's
substantial contribution.  To support his request, counsel applies
first the Senate Factors and then the DOJ internal guidelines to
the circumstances here.

Regarding the first two Senate factors, contribution of significant information and contribution to the result, counsel not only details the extent of Pallares's involvement, but also quotes statements in letter written by the U.S. Attorney's Office for the Southern District of Texas, signed by Keith Wyatt and Michelle Zingaro, to John Kolar regarding their and DCIS's position on the Relator's share of the recovery, attached as Ex. 1 to Relator's Reply (#76).  Urging the DOJ to award Pallares 24% of the entire $13.2 million even though the trucking and shelter invoice charges were not included in the Relator's complaint, the letter noted that Itani pled guilty to Count I, i.e., conspiracy to defraud the government with respect to a conspiracy to conceal overcharges in American Grocers' shelter invoices and the creation of bogus trucking charges, of a Superceding Criminal Indictment.  After the Government admitted it was stumped in trying to show that dates were altered on particular items shipped to the military, it turned its database over to Pallares's counsel and arranged for Pallares to review hard copies of documents at DCIS.  The Assistant U.S. Attorneys stated in their letter that Pallares "reviewed every invoice, and identified the military shipments by the package size and the large volume of goods"; that she found the "'loadout sheets'[14]--something only an insider would know to look for--that

---

[14] Counsel explains,

Itani used an internal document called a "loadout" sheet

Samir Itani used to direct his workers as to what dates to change";
that Pallares spent substantial time locating and reviewing
documents and "*the results were what enabled [the Government] to
intervene*"; and that a PowerPoint presentation prepared by Pallares
and given to defense counsel by the Government "*turned the tide in
[the Government's] direction. The Evidence was quite persuasive.*"
*Id.* Thus Pallares identified the loadout sheets critical to the
case and to the Government's ability and decision to settle the
case, as well as numerous disclosure statements, legal and factual
analyses, recommendations on strategy, and calculations of damages.
There were numerous meetings with the Government at which Pallares
and her counsel provided counter-arguments to those of Itani and
American Grocers.  The Government concedes that Pallares and her
attorney have had substantial input into developing arguments and
strategies.  They have had hundreds of communications with the
Government and its agencies regarding both civil and criminal
investigations possible only after Pallares' disclosure of the

---

that mimicked the *proforma* invoice but had an extra
column, usually marked "S/L" to indicate "shelf life."
For each product with a short shelf life, Itani would
list a number in the "S/L" column that indicated the
number of shelf-life months to be reflected on the new
label.  In cases in which changing the date was difficult
or Itani deemed the shelf life sufficient, he would
simply list the word "match" in the "S/L" column, to
indicate to his employees that they should match the date
originally listed.  His warehouse staff would take the
so-called loadout sheets, and follow Itani's directions
to eradicate the original product dates and re-label or
reprint the new shelf life date on the product.

fraud.  Pallares frequently traveled to the DCIS office in Houston to review hard copies of documents seized from American Grocers and a forensic copy of Itani's computer.  Pallares and her attorney worked closely with Special Agent Chad Bailey of the USDA  and Special Agents Lonnie Taylor and Monica Moses of DCIS, with Bailey and Taylor testifying at the hearing on June 15, 2010 about her contributions and concerns for her safety to justify a 24%-of-the-settlement-amount.

It is undisputed that the Government had no prior knowledge of the fraud, and it has conceded that it would not have discovered any of the fraud without the Relator, fulfilling Senate Factor 3.

Regarding the DOJ guidelines, Pallares represents that although she worked at American Grocers for four years before reporting the fraud, the Government never raised the issue of delay until now.  Her attorney argues that the delay is excusable because she is not an attorney and was not familiar with the FCA.  At the hearing counsel noted that it took Pallares a year to find lawyers who would take the case to the government, and that once she did, she reported the fraud.  Even more persuasive, Pallares was afraid that disclosing the fraud might place her family in danger and threaten her employment.  Counsel represented that after Pallares left American Grocers in 2003, she tried to start her own grocery export business, but that Itani had her blackballed so suppliers refused to sell to her.  Furthermore, during the Government's

-21-

investigation, Itani repeatedly impugned her integrity, while his brother, Ziad, intimidated her by pulling up behind her when she was picking her child up from school and driving by her house.[15] The investigating agents gave Pallares their personal cell phone numbers in case of trouble, and they offered to place her in the witness protection program, but she declined.

Regarding guidelines 3-5, Pallares's disclosure of the fraud to the government, with resultant execution of the search warrant, and the filing of her *qui tam* action caused Itani and American Grocers to cease their illegal activities.  Moreover Relator exposed a nationwide fraud:  the out-dated food products were to be sent to military vendors across the country, including Beaver Street Fisheries, Inc. in Jacksonville, Florida, LambWeston (ConAgra Foodservice-Specialty Products) based in Kennewick, Washington, and Brenham Wholesale Grocery Co. in Brenham, Texas. Relator warned the government of a significant safety issue, i.e., the threat to the health and safety of American troops in the Middle East from stale, spoiled or disease-contaminated food products passed through under fraudulent dates and forged health certifications.

Relating to DOJ guidelines 6-9, from her full-time employment, and from working evenings and weekends to review documents or

---

[15] Special Agent Taylor testified at the hearing that Ziad had been brought to this country by his brother from Lebanon, where he had been involved in criminal conduct.

taking days off for interviews with government agencies, Realtor maintains that she provided extensive, first-hand knowledge of the details of the fraudulent practice of which the Government had no prior knowledge.   She also provided substantial assistance to and cooperated with the Government, as discussed.   Counsel for Relator submitted at the hearing two charts, Exhibits 1 and 2 to a Supplement (#77), summarizing the factual bases for Pallares' arguments regarding the Senate Factors and DOJ Guidelines.

### DOJ's Response (#74)

The DOJ offers to recommend that the Government pay Pallares 20% of $10 million, which constitutes the amount of the settlement attributable to the claim of sales of expired food to the military, which was the claim asserted by Relator in her complaint.   The other $5 million is attributable to the bogus trucking charge and shelter invoice schemes, which were not in her complaint and which she was unaware of until the agents disclosed them to her in seeking her assistance.[16]   Without citing any authority, the DOJ further states that Court intervention on relator share is inappropriate at this stage of the litigation and should wait until there is a final settlement.   Nevertheless, if the Court decides to address the issue now, the DOJ argues that Pallares is not entitled to an award of 24% and that whatever percentage the Court

---

[16] Thus of the total value of the $15 million settlement, 66% is attributable to the changed expiration date claims and the rest to the bogus truck and shelter invoice charges claims.

determines she should ultimately receive is allocable only to the single claim in her complaint as a matter of law.

The Government does not dispute the essential facts presented in Relator's motion: it does not challenge her contention that the criminal investigation was initiated as a result of her *qui tam* action, that she was of substantial assistance to the agents in establishing probable cause for the search of the American Grocers' warehouse, that Samir Itani likely would never had been prosecuted or his criminal acts discovered without her disclosure and aid, and that she made herself available on numerous occasions, by telephone and in person, to assist the agents in reviewing documents and explaining business practices and record keeping of American Grocers.

The DOJ does object to Pallares's contention that she warned of a potential safety issue from the shipment of stale, spoiled, or possibly contaminated food products under forged USDA health certificates because there is no evidence that the food at issue caused any injury or illness to United States military personnel. In response, Mr. Androphy correctly pointed out that the DOJ guideline states require only that the Relator "warn" the Government of a significant safety threat, not that she prove the threat to safety caused actual injury.

Second, the DOJ also objects to the four-year or more delay[17] in the Relator's reporting of the fraud.

The DOJ argues that when the United States settles multiple claims with a defendant, the relator's share of the settlement must be determined on a "claim-by-claim" basis. *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 106 (3d Cir. 2000). The relator must establish that he is a proper relator and entitled to a recovery on each and every claim or fraudulent scheme for which he seeks a recovery. *Cf. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 475 (2007)(in a public disclosure bar analysis, differentiating between claims alleged by relator and claims on which the United States recovered, holding that relator was not the original source of the latter and rejecting relator's attempt to seek "jurisdiction in gross" as impermissible "claim smuggling"). The DOJ quotes the Sixth Circuit Court of Appeals in *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 523 (6th Cir. 2007)("*Bledsoe II*"):

> There is no persuasive reason for differentiating between [a] [r]elator, who has filed a *qui tam* action concerning matters unrelated to the allegations covered by the Settlement Agreement, and an individual who informs the government of FCA violations but never files a *qui tam* action at all, the latter of whom undisputedly is not entitled to recover proceeds from a settlement agreement that overlaps with the information he provided to the

---

[17] The DOJ says it is not clear whether the four years is in addition to, or includes, the two years between her departure from American Grocers in 2003 and her filing of the original *qui tam* complaint in 2005.

government.   Simply put, a valid *qui tam* action must
exist with respect to the FCA violations covered by the
Settlement Agreement.

The DOJ insists that a threshold requirement for a relator to share
in the government's recovery under the FCA is the filing of a valid
*qui tam* action.   *United States ex rel. Bledsoe v. Community Health
Systems, Inc.*, , 342 F.3d 634, 650 (6th Cir. 2003)("*Bledsoe I*");
*United States ex rel. Donald v. Univ. of Cal. Bd. of Regents*, 329
F.3d 1040, 1044 (9th Cir. 2003)(the FCA's requirement that the
United States share settlement proceeds with relators when it
intervenes in a *qui tam* action is "dependent on the private party
having a valid cause of action" under the FCA); *United States ex
rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 111-12 (3d
Cir. 2007)(following *Bledsoe I* and *Donald* and concluding that under
the FCA provisions, "a relator is not entitled to share in the
proceeds of an alternate remedy when the relator's *qui tam* action
under § 3729 is invalid.").   A relator that fails to plead his
fraud allegations with sufficient particularity under Fed. R. Civ.
P. 9(b) is not entitled to a share of the government's recovery
because he has not alleged a valid *qui tam* action regarding the
settled claims.   *Bledsoe II*, 501 F.3d at 522.   Thus where the
relator did not even assert claims in the complaint, as here, the
relator is not entitled to recovery on those claims.

The DOJ disagrees with Relator's argument that she is entitled
to share in the recovery related to the claims she has not pleaded

-26-

in her complaint because this is an inability-to-pay suit.  The law requires proportional allocation of the funds among claims. Furthermore such an allocation is *prima facie* just, whether the settlement is on the merits or based on a defendant's inability to pay the full amount that might be obtained in a merits settlement. There is no justification for placing a disproportionate burden on the Government because Defendants here lack sufficient funds to pay full double, or even single, damages.  The burden should be spread proportionately.

As for application of the DOJ guidelines, the DOJ disagrees that three factors apply to increase Pallares's share:  prompt reporting of the fraud, attempting to stop the fraud, and warning the Government of a significant safety issue.  Not only is there no evidence that any of the food supplied by Itani caused injury or illness among U.S. military personnel, but if Pallares believed that Itani's conduct posed a substantial health and safety risk to the troops, she was under the strictest obligation to report the fraud promptly, but failed to do so.  Even though she is not an attorney and was not familiar with the FCA, neither circumstance was a prerequisite to her reporting it to an investigative agency. As for concerns about her family and employment, every whistleblower must be concerned about this issues.  As for her claim that she tried to start her own business but was blackballed by Itani, that fact does not excuse her delay in reporting the

fraud.  *See General Electric*, 808 F. Supp. at 584 (rejecting relator's request for 25% of the proceeds and awarding 22.5% because the relator delayed in reporting the fraud); *United States ex rel. Coughlin v. International Business Machines Corp.*, 992 F. Supp. 137, 142 (N.D.N.Y. 1998)(relator's request for 25% rejected and reduced to 15% because he did not report the fraud until his retirement from the company).  Some courts have held that the upper range of the award should be restricted to cases where the relator's conduct is virtually flawless and where the substantial assistance of the relator continues through complex pretrial proceedings and trial.  *United States v. Covington Technologies, Inc.* 1991 WL 643048 (C.D. Cal. Oct. 21, 1991); *Coughlin*, 992 F. Supp. at 142.[18]

## Court's Decision

First, because it is central to the issue of Relator's award, the Court addresses the DOJ's argument that where more than one claim is asserted against a defendant, the Court must apply a "claim by claim" analysis to determine which claims the relator is entitled to recover a share on and that Pallares is limited to an

---

[18] This Court notes that there is authority on the other side. *See, e.g., Pedicone*, 807 F. Supp. at 1353 (holding that there is no support for "the government's contention that the qui tam Plaintiff's share should differ depending upon whether the case is settled or tried"); *Quorum Health*, 171 F. Supp. 2d at 1337 (rejecting the trial factor as significant and observing that the parties had spent nearly two years in detailed and intense mediation and the relator's share should not be reduced "because this exemplary effort in dispute resolution was a success."

award based on the only claim asserted in her *qui tam* complaint, the altered-label food products.  Mr. Kolar relies on *Marena*, 205 F.3d at 106; *Rockwell Int'l*, 549 U.S. at 475; and the *Bledsoe II* litigation.

Section 3730(d) provides for awards to successful relators, with different categories, requirements, and ranges in the amount of the proceeds for a relator's award, depending upon the circumstances of the particular case.  "Care . . . must be taken not to simply lump together its various subparts.  While it is important to appreciate the relationship between the various portions because each has its unique functions, maintaining a proper distinction is vital for properly interpreting and applying the statute."  Joel D. Hesch, *Restating the "Original Exception" to the False Claims Act's "Public Disclosure Bar,"* 1 Liberty U.L. Rev. 111, 118-19 (Winter 2006).  *See also* Paul D. Scott, *Settlement of a Qui Tam Action*, NO 2CFCB ABA-LGLED H-1 ("II.  The Relator's Share")(page numbers unavailable)(2001).

The DOJ's opposition to Relator's motion fails to distinguish the different provisions under § 3730(d),[19] and it erroneously

---

[19]   Section 3730(d) in its entirety states,

(d) **Award to qui tam plaintiff.**–

**(1)** If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the

proceeds of the action or settlement of the claim,
depending upon the extent to which the person
substantially contributed to the prosecution of the
action.  Where the action is one which the court finds to
be based primarily on disclosures of specific information
(other than information provided by the person bringing
the action) relating to allegations or transactions in a
criminal, civil, or administrative hearing in a
congressional, administrative, or Government Accounting
Office report, hearing, audit, or investigation, or from
the news media, the court may award such sums as it
considers appropriate, but in no case more than 10
percent of the proceeds, taking into account the
significance of the information and the role of the
person bringing the action in advancing the case to
litigation.  Any payment to a person under the first or
second sentence of this paragraph shall be made from the
proceeds.  Any such person shall also receive an amount
for reasonable expenses which the court finds to have
been necessarily incurred, plus reasonable attorney's
fees and costs.  All such expenses, fees, and costs shall
be awarded against the defendant.

**(2)** If the Government does not proceed with an action
under this section, the person bringing the action or
settling the claim shall receive an amount which the
court decides is reasonable for collecting the civil
penalty and damages.  The amount shall not be less than
25 percent and not more than 30 percent of the proceeds
of the action or settlement and shall be paid out of such
proceeds.  Such person shall also receive an amount for
reasonable expenses which the court finds to have been
necessarily incurred, plus reasonable attorney's fees and
costs.   All such expenses, fees, and costs shall be
awarded against the defendant.

**(3)**   Whether or not the Government proceeds with the
action, if the court finds that the action was brought by
a person who planned and initiated the violation of
section 3729 upon which the action was brought, then the
court may to the extent the court considers appropriate,
reduce the share of the proceeds of the action which the
person would otherwise receive under paragraph (1) or (2)
of this subsection, taking into account the role of that
person in advancing the case to litigation and any
relevant circumstances pertaining to the violation.  If

-30-

imposes the standards for claims primarily based on publicly disclosed information, which are subject to the public disclosure bar, on Pallares's *qui tam* complaint, which is not based on publicly disclosed information.

Section 3730(d)(1) addresses the relator's share in two quite different situations when the government intervenes and (1) the claims are not based primarily on publicly disclosed information and (2) where the claims are based on publicly disclosed information.

In the first case, where the claims are not based primarily on public information, if the government intervenes the relator is to receive between 15-25% of the proceeds recovered by litigation or settlement. The determination of the percentage in such a situation expressly and solely "depend[s] upon the extent to which

---

the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

**(4)** If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

Subsections 3 and 4 are not relevant to the question before the Court in this action.

the person substantially contributed to the prosecution of the action." In the case *sub judice*, it is undisputed that there was no prior or public disclosure before Relator went to the Government and filed her *qui tam* action. The legislative history provides some insight. The House version of what became § 3730(d)(1) stated in relevant part:

> In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above 15% and up to 25%.

132 Cong. Rec. H9382-03 (Oct. 7, 1986)(Westlaw ed.)(statement of Rep. Berman). The Senate version of the bill lists the following factors for a court to review in determining the relator's award:

> (1) The significance of the information provided to the government by the qui tam plaintiff;
>
> (2) The contribution of the qui tam plaintiff to the result; and
>
> (3) Whether the information in the suit provided by the relator was previously known to the government.

S. Rep. No. 99-345, at 28 (1986), reprinted in 1986 U.S.C.A.A.N. 5266, 5293. *See, e.g., Quorum Health*, 171 F. Supp. 2d at 1332-33 (applying House and Senate factors to give relator a "robust" award).

In the second circumstance, when the claims are primarily based on publicly disclosed information in one of the ways enumerated in § 3730(e)(4)(A), if the government intervenes, a

different award scale applies:  the court may award up to ten percent of the proceeds, taking into consideration "the significance of the information and the role of the person bringing the action."  Furthermore, under  the "public disclosure bar," a relator's allegation based on a public disclosure is subject to dismissal for lack of subject matter jurisdiction **unless** the relator can satisfy the "original source" exception under  31 U.S.C. § 3730(e)(4)(A) and (B):

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transaction in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

*See, e.g., United States ex rel. Regan v. East Texas Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 176-77 (5th Cir. 2004)(the public disclosure bar divests courts of jurisdiction over qui tam suits where the allegations are based upon a public disclosure, unless the relator can qualify as an "original source" under the FCA).  "The purpose of the jurisdictional bar is to accommodate the primary goals of the False Claims Act:  (1) 'promoting private citizen involvement in exposing fraud against the government' and

-33-

(2) 'preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud.'" *Id.* at 174, *citing United States ex rel. Laird v. Lockheed Martin Eng'g & Sc. Servs., Co.,* 336 F.3d 346, *vacated on other grounds*, 336 F. 3d 346 (5th Cir. 2003).[20]

In the cases cited by the DOJ to justify the claim by claim analysis it desires to impose here on Pallares's award request, the claims were all subject to the public disclosure bar and the original source exception and therefore the courts applied the second award analysis.   Because the original source exception determines the court's jurisdiction over each claim, a claim by claim analysis is logically appropriate to determine whether the relator is the original source of each in a multi-claim action subject to the jurisdictional bar.   Where the court has no

---

[20] The Fifth Circuit has defined "direct" knowledge as "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *Laird*, 336 F.3d at 355-56 (noting that Congress' intent was "to encourage qui tam suits brought by 'insiders, such as employees who come across the information of fraud in the course of their employment."   "Independent knowledge" does not rely on any public disclosures. *Id.* at 355.   A court must "look to the factual subtleties of the case before it and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *Id.* at 356.

jurisdiction over a particular claim because the relator did not have direct and independent knowledge of it, it should also lack jurisdiction to grant an award based on that claim. For any claims where the relator did have direct and independent knowledge of, and thus was the original source, for a particular fraud which put the government on the trail of that particular fraud, an award based on that information may be justified.

As noted, once a *qui tam* suit is commenced in federal court the government must decide whether to intervene. It may decide to do so, or, alternatively, as here, independently or concurrently seek criminal or administrative remedies based on an investigation triggered by the relator's information. Section 3730(c)(5) of the FCA provides in relevant part,

> Notwithstanding subsection (b)[actions by private persons], the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. . . .

The relator is entitled to a share of any government recovery obtained outside the *qui tam* action only if the government obtains it through pursuing an "alternate remedy." Thomas L. Harris, *Alternate Remedies & False Claims Act: Protecting Qui Tam Relators In Light of Government Intervention and Criminal Prosecution*

*Decisions*, 94 Cornell L. Rev. 1293, 1304 (July 2009).  The statute does not clearly define what qualifies as an alternate remedy other than an administrative remedy or whether it includes criminal proceedings.  *Id.*, generally.

Counsel for Pallares cites *United States v. Bisig*, No. 100CV335JDTWTL *et al.*, 2005 WL 3532554 (S.D. Ind. Dec. 21, 2005) to argue that the government's criminal prosecution of Itani was an "alternate remedy" to Pallares's *qui tam* action to circumvent having to pay a relator's share of the recovery in the civil suit. In *Bisig*, the district court emphasized that § 3730(c)(5) permits the Government to pursue "**any** alternate remedy available to the Government"; moreover it construed  the relator's right to "the same rights in such proceeding as such person would have had" if the *qui tam* action had continued to mean that if the government elected not to intervene in the civil action, but sought to recover from the defendant through a criminal forfeiture proceeding, the relator's rights to a share from that alternate remedy are preserved.  *Id.* at *4-5, *citing* *Bledsoe I*, 342 F.3d 634,[21] and

---

[21] In *Bledsoe I*, Sean Bledsoe filed a *qui tam* suit against healthcare provider Community Health Systems, Inc. ("CHS"), charging it with Medicare and Medicaid billing fraud.  The Government elected not to intervene, but filed a separate action against CHS based on the same facts that Bledsoe had alleged in his *qui tam* complaint.  The Government argued that Bledsoe's complaint was defective, failed to plead with particularity as required by Rule 9(b), and that he was not the original source of the information.  In this "case of first impression" the Sixth Circuit found that the government's settlement of its separate action

*United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004 (9th

Cir. 2001).[22]

Because there is no certainty whether the "alternate remedy"

includes criminal proceedings[23] and no courts have followed the

_____

against CHS for repayment to the Government constituted an
"alternate remedy" and that Bledsoe was entitled to his statutory
share.

[22] In *Barajas* the relator brought a *qui tam* action asserting
that a defense contractor falsified test results for flight data
transmitters that it subsequently sold to the Air Force.   The
Government elected not to intervene but commenced an administrative
proceeding to suspend or disbar the contractor from further
contracts with the Department of Defense.   It reached a settlement
with the contractor.   The Ninth Circuit concluded that the
disbarment proceedings were an "alternate remedy" under §
3730(c)(5), from the settlement of which the relator was entitled
to recover a share, in accord with the purpose of the FCA to
encourage private individuals to come forward with information
about fraud that otherwise might remain concealed.

[23] As described by Claire M. Sylvia in The False Claims Act:
Fraud Against the Government, § 11:86 ("Alternate remedy:   31
U.S.C. § 3730(c)(5)-Criminal Proceedings")(Database Updated April
2010):

> Whether a criminal proceeding is an "alternate
> remedy" to a civil false claims act case is undecided.
> On the other hand, a criminal proceeding is for purposes
> of punishment and is not typically considered a "remedy"
> available to the Government.   Because of the procedural
> protections afforded criminal defendants, it would be
> unlikely that a relator could participate in a criminal
> proceeding and exercise the "same rights in such
> proceeding" as the relator would have had in pursuing the
> civil qui tam action.   On the other hand, while criminal
> proceedings are aimed at punishment, they can include a
> remedy in the form of restitution.   In addition, the
> relator's rights are not limited to rights of
> participation (which can under the statute be restricted
> even in a civil qui tam action) and include rights to
> share in the proceeds.   If a criminal proceeding is not
> considered an alternate remedy, the Government could

*Bisig* court's lead, the Court prefers to rest its award to relator on § 3730(d)(1) where the relator's allegation is not based on publicly disclosed information and where the standard for determining the applicable percentage is expressly, solely, and unambiguously "the extent to which the person substantially contributed to the prosecution of the action."

Not only does the Court conclude that the DOJ's legal argument that a relator's share must be analyzed on a claim-by-claim basis is wrong, but in its discretion the Court finds under the undisputed circumstances here that Pallares's counsel has made a persuasive case justifying an award to her of 24% of the total $13.2 million settlement, if the settlement is finalized. The DOJ agreed that Mr. Androphy's recitation of the central facts regarding Pallares's substantial contribution to the Government's investigation, criminal prosecution, and settlement is accurate and that without her initial information and her significant and ongoing help over the past five years in deciphering and explaining the documents and business practices of Defendants, the fraud most likely would not have been uncovered and the settlement achieved. Pallares's delay in reporting the fraud to the government is reasonable in light of her ignorance of the law, difficulty in finding legal representation, and concerns for her family's safety

---

effectively attempt to cut the relator out of a case that the relator brought to the Government.

and for her employment, and the results indicate that the delay was not prejudicial. It is noteworthy that the Government agents intimately involved in the extensive and lengthy investigation and the United States Attorney's Office's for the Southern District of Texas, which brought criminal charges against Itani, agree that Pallares fully deserves an award of 24% of the Government's full settlement recovery of $13.2 million, and they disagree with the DOJ's stance. Moreover, the Court agrees that it would be inequitable and contrary to the purpose of the FCA to permit the government to arbitrarily cap the settlement allocations, while allowing Itani to retain his expensive home, properties, and business, and substantially deprive Paralles of the amount she would otherwise have been entitled to recover based on and arising from her original claim. Such an unfair result would appear to award the fraudfeasor at the expense of the relator who exposed him.

Accordingly the Court

ORDERS that Pallares's motion (#69) for a 24% award from the total $13.2 million settlement between the Government and Defendants, if it is finalized, is GRANTED. This action shall

remain sealed until the settlement is finalized.

**SIGNED** at Houston, Texas, this 2nd day of July, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE