United States Courts
Southern Dist⸱⸱⸱⸱⸱ Texas
ENTERED

NOV 0 3 ENT'D
2010 ᴧᴧ
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

UNITED STATES OF AMERICA ex rel. §
DELMA PALLARES, §
§
Plaintiffs, §
§
VS. §
§
SAMIR ITANI, AMERICAN GROCERS, §
LTD., AMERICAN GROCERS, INC., §
AND INTERNATIONAL GROCERS, INC., §
§
Defendants. §

*Un* Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

CIVIL ACTION H-05-3018
FILED EX PARTE AND
UNDER SEAL

## SEALED OPINION AND ORDER

Pending before the Court in the above referenced *qui tam* action is the United States's motion for reconsideration (instrument #80) of this Court's Opinion and Order (#79), entered on July 2, 2010.

The United States first argues that the Court erred in concluding that *all* the cases cited by the Department of Justice (for the rule that a relator may not share in the recovery for a claim that she did not plead) were limited to the public disclosure situations and the original source exception under the False Claims Act ("FCA"), 31 U.S.C. §3730(e)(4)(A) and (B).[1]  Specifically the

---

[1] Title 31 U.S.C. § 3730(e)(4)(A) and (b) provide,

**4(A)**  The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

United States points to two cases that were not subject to the public disclosure bar: *United States ex rel. Bledsoe v. Community*

---

(i) in a Federal criminal, civil or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and who has voluntarily provided the information to the Government before filing an action under this section.

These requirements are jurisdictional and bar a Court from hearing a case (1) based on information that has been publicly disclosed before a relator files a *qui tam* action and the action is based on the public disclosure, and, if so, (2) where the relator is not an original source of the information upon which the relator's allegations are based. *Rockwell Int'l Corp. v. United States*, 127 S. Ct. 1397, 1405-06 (2007).

On May 20, 2009 Congress enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub. L. 11-21, § 4, 123 Stat. 1617 (2009), which amended the FCA. FERA expressly states the amendments "shall take effect as if enacted on June 7 2008, and apply to all claims under the False Claims Act that are pending on or after that date," so its changes are not applicable to this case. In addition, the Patient Protection and Affordable Health Care Act of 2010 ("PPACA"), P.L. 111-148, enacted March 23, 2010, as amended by the Health Care and Education Reconciliation Act of 2010, P.L. 11-152, enacted March 30, 2020, also amended the FCA, but is not applicable to this action.

Health Systems, Inc., 501 F.3d 493, 523 (6th Cir. 2007)("Bledsoe

II")[2] and United States ex rel. Papazian v. American Production

Industries, Inc., 58 F.3d 404, 406 (9th Cir. 1995).[3]  The United

States argues that under this Court's analysis, if a second relator

had come forward and filed a qui tam suit on the bogus trucking

charge and/or the shelter invoice schemes at issue here, two claims

which were not pleaded by Relator Delma Pallares but for which she

seeks a share of the recovery, the Government would have to pay two

shares for the same claims in direct contradiction of the FCA's

"first-to-file" rule.[4]  They urge the Court instead to rule that a

---

[2] The United States explains that in United States ex rel.
Bledsoe v. Community Health Systems, Inc., 342 F.3d 634, 645-46 (6th
Cir. 2003)("Bledsoe I"), the court dismissed some of the claims
that were publicly disclosed for failure to meet the particularity
requirement of  Fed. R. Civ. P. 9(b).  The remaining claims were
then addressed in Bledsoe II, in which the Sixth Circuit Court of
Appeals concluded that the relator could not share in a separate
settlement obtained by the Government because he had not validly
pleaded those claims that overlapped with the claims covered by the
settlement  agreement.   501 F.3d at 522.   The United States
maintains that the public disclosure bar had no bearing on Bledsoe
II.

[3] The United States summarizes the facts in Papazian.   After
two whistle blowers reported the selling of adulterated juice
products to the Government's Defense Criminal Investigative Service
agent, it conducted an investigation and ultimately entered into a
civil settlement with two companies.   During the investigation the
agent learned that the two whistle blowers intended to file a qui
tam action, but they failed to do so until after they read about
the settlement in the newspaper.   The court rejected their claim
for part of the settlement proceeds on the ground that they failed
to meet the prerequisite of filing a timely complaint under the
False Claims Act ("FCA").

[4] The FCA's "first-to-file" bar is found in 31 U.S.C. §
3730(b)(5), which like the public disclosure bar, is jurisdictional

relator must actually file a claim to share in any recovery for that claim.

The Government identifies as the Court's second error its failure to recognize that this is a public disclosure case where Pallares lacks standing as she is not an original source of the bogus trucking charges and shelter invoices claims and is therefore barred from participating in the $5 million recovered for them. The DOJ maintains that government agents disclosed the bogus trucking charges and shelter invoice schemes to Pallares, as it did

---

and serves to "prevent[] a private party from bringing a *qui tam* action regarding matters already the subject of public knowledge unless he is an original source of that information: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 560 F.3d 371, 376-77 (5th Cir. 2009). In essence it stands for the proposition that if a person's claim has already been filed by another person, the court lacks subject matter jurisdiction and must dismiss the second action. *Id.* The purpose of both bars is "discouragement of parasitic lawsuits." *Id.* at 377. Citing cases from the Third, Sixth, Ninth, Tenth, and D.C. Circuit Courts of Appeals the Fifth Circuit agreed with their conclusion that as long as the essential facts of the previously filed *qui tam* suit and the later suit are related, the later suit is barred even if it contains some different details. *Id.* at 377-78.

> We agree with these circuits that the applicability of § 3730(b)(5) should be determined under an "essential facts" or "material elements" standard. Accordingly, as long as the later-filed complaint alleges the same material or essential elements of fraud described in a pending *qui tam* action, § 3730(b)(5)'s bar applies.

*Id.* Therefore "a relator cannot avoid § 3730(b)(5)'s first-to-file bar by simply adding factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in a prior complaint." *Id.* at 378.

the records of American Grocers that the Government obtained
through a search: thus, contends the Government, Pallares was a
member of the public with respect to these claims because she
lacked knowledge of them before the agents told her about them.
*See, e.g., United States ex rel. Montgomery v. St. Edward Mercy
Medical Center*, 2007 U.S. Dist. LEXIS 73376, *7 (W.D. Ark. Sept.
28, 2007)(finding public disclosure where, after filing her
complaint, relator learned of the allegations while reviewing
records the Government obtained by subpoena during an investigation
and from disclosure to her by an Assistant United States Attorney
and investigating agents).  Furthermore the allegations about the
bogus trucking charges and shelter invoice schemes were the subject
of a criminal indictment and plea agreement filed on the Court's
public docket.  *United States v. Itani*, Case No. 4:07-CR-00310,
docket entries #1 (Indictment, filed 7/23/07), #109 (Superseding
Information, describing the two schemes, filed 7/20/09), and #114
(Plea Agreement, filed 7/21/09).  Moreover the criminal
investigation was disclosed in the media in various articles that
constituted public disclosure within the meaning of 31 U.S.C. §
3730(e)(4)(A).  *See, e.g.,* "Houston Businessman is Key Figure in
U.S. Probe of Iraq Food Contracts," *Wall Street Journal*, 10/18/07,
http://www.corpwatch.org/article.php?id=14762;  United   States
Attorney's Office for the Southern District of Texas press release:
"Houston Food Distributor Convicted of Fraud in Iraq Food

Contracts," 7/21/09, http://www.justice.gov/usao/txs/releases/July %202009/072109Itani.htm; Department of Justice press release announcing the guilty plea of Stephen Patrick Day for conspiring with American Grocers to submit the bogus charges, http://houston.fbi.gov/dojpressrel/pressrel09/ho041309.htm. Because Pallares was not the original source of these claims, which were not in her complaint, she is barred from participating in the recovery for them. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007)(finding a relator was not an original source where, although his complaint put the Government on the trail of defective "pondcrete," the Government pursued a theory of pondcrete deterioration that differed from the relator's defective piping theory); *United States ex rel. Merena v. SmithKline Beecham Corp.*, 209 F.3d 106 (3d Cir. 2000)(Alito, J.)("[W]e have concluded that the relators' share of the proceeds must be based on a claim-by-claim analysis and that the relators are not entitled to any share of the settlement attributable to claims that would have been subject to dismissal under section 3730(e)(4) prior to the Government's intervention."). Similarly that Pallares put the Government on the trail of the bogus trucking and shelter invoice claims does not entitle her to a share of recovery on those claims. The bar to her participation in the settlement of these claims is jurisdictional. Therefore the Court should amend it ruling to limit her share to the $10 million representing the portion of the

total settlement value allocable to her expired/altered-food-date claim.

In her response in opposition, Pallares objects to the Department of Justice's ("DOJ's") current decision "to second-guess the [Houston United States Attorney's Office's ("USH's")] estimation of Pallares's contributions and to raise a public disclosure bar never before raised." She argues that the Court correctly apportioned her share "based upon the Defendants' full agreed settlement payment of $13.2 million, because no authorities support apportionment that would cause a relator to bear the loss when a fraudster cannot or does not repay his entire liability under the [FCA], and because contrary to the DOJ's new position, the public disclosure bar does not apply to this case."

Pallares maintains that *United States v. Bisig*, Nos. 100CV335JDTWTL, 101CV0030JDTWTL, IP 02-CR-112-01-T/F, 2005 WL 3532554, *4, 10 (S.D. Ind. Dec. 21, 2005), has a broader importance than the proposition that, as an "alternate remedy,"[5] a successful relator may recover its share from money recovered in a criminal indictment and forfeiture action arising out of the same conduct as an FCA action. *Id.* at 3, 4 ("This court holds that when the United

---

[5] In addition to having the right to intervene in a *qui tam* suit initiated by a relator, the United States "may elect to pursue its claim through any alternate remedy available to the Government." 31 U.S.C. § 3730(c)(5). If it so chooses, the relator "shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id.*

States declines to intervene in the *qui tam* action, but seeks recovery of defendant's assets through criminal forfeiture, the United States has engaged in an 'alternate remedy' for the purposes of § 3730(c)(5)"; "the United States cannot sidestep the requirement to share recovery with the relator, who contends that it first discovered the fraud and informed the United States regarding the fraud, by merely electing to recover through criminal forfeiture proceedings.").[6] Pallares agues that *Bisig* also holds that the Government may not reduce a relator's share of the proceeds by collecting on other claims and thereby create an "ability to pay" problem on the relator's rightful claims. *Id.* Furthermore, regardless of how the Government recovers the ill gotten gains of the fraud, whether through intervention in a *qui*

---

[6] Emphasizing that the purpose of the 1986 amendment of the FCA was "'to encourage more private suits'" because "'[i]n the face of sophisticated and widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds,'" the *Bisig* court relied on *Bledsoe I*, 342 F.3d at 648-49 (Government elected not to intervene in *qui tam* action but reached an independent settlement with defendants), and *United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004, 1010-13 (9th Cir. 2001)(Government chose not to intervene but settled administrative proceedings against a defense contractor) for its interpretation of "alternate remedy." 2005 WL 3532554, *4, 5 (holding that "because the United States has achieved a monetary recovery from the Defendant in a manner outside of the *qui tam* action, and that recovery made an actual monetary recovery by the relator in the *qui tam* action either impossible or futile, the United States, in effect, elected to pursue its claim through an alternate remedy under § 3730(c)(5).").

Here the Government did not intervene in Pallares's suit and settled with Defendants in the criminal proceeding for less than the value of the charges because it determined they were unable to pay more.

*tam* action or criminal forfeiture, "the relator must be rewarded for its part in uncovering the fraud" because it is "only fair to allow the relator to be rewarded for its role in stopping the fraud." *Id*. at *5,6.

Pallares insists that reducing her share because Defendants agreed to a significantly lower settlement in the criminal proceeding than the Government could have sought is neither reasonable nor equitable, even if she were not entitled to a share on the entire proceeds of the settlement under § 3730(d)(1) and regardless of whether the relator's share is always to be calculated on a "claim-by-claim" basis.    The claim-by-claim approach still does not determine which claim gets paid first, a key factor in a limited fund case.    Pallares emphasizes that none of the cases cited by Defendants that employ a claim-by-claim analysis involve a defendant that was unable to pay its FCA liability.   Here the Government decided that Defendants would have to declare bankruptcy or go out of business if they had to pay more than the reduced settlement amount, and it chose to keep American Grocers in business and the Itanis in an expensive, mortgage-free house in Memorial despite their admitted fraud rather than require a larger settlement amount.    She argues that where the United States has contributed to an "ability-to-pay" problem, the claims on which a relator is entitled to a share, here the expired/altered-date claim, should be paid in full before recovery

is allocated to other claims.

Here the Defendants have agreed to pay the Government only
$13.2 million (in addition to a credit for a past payment) to
resolve the entire *qui tam* action, even though Relator's counsel
maintains that Defendants have more funds available.  The parties
agree that the real value of the expired/altered-date claim alone,
to which Pallares' share is uncontested, is $16.5 million, based on
documentation located by Pallares to date.[7]

Both the DOJ and USH concur that Pallares has provided
"substantial assistance" to federal investigations in investigating
not only the date scheme, but also the trucking fraud scheme,
regarding which three individuals subsequently pleaded guilty to
conspiracy charges.  Pallares also emphasizes that the DOJ never
told her during the investigation that "she was working for free."
By the DOJ's prioritizing the two claims (the $3.2 million trucking
and inflated invoice claims) that it argues are not subject to her
relator's share, even though they were discovered only because of
Pallares' *qui tam* suit and her assistance in interpreting business
documents, Pallares' share would be diminished the more fraud her
lawsuit uncovered that she did not plead in her initial complaint.
As observed in *Bisig*, permitting the Government to circumvent the

_____

[7] Relator notes that Defendants sold approximately $50 million
worth of food products to the United States military, but that
because the Government determined that Defendants do not have the
money to pay more than $13.2 million, no additional investigation
has been conducted.

payment of the relator's share in this manner would contravene public policy.

Examining the legislative history of the statute, Pallares emphasizes that the FCA was enacted to "encourage . . . private enforcement suits." S. Rep. No. 99-345 at 23-24 (1986), *reprinted in* 1986 U.S.C.A.A.N. 5266, 5288-89. "In the face of sophisticated and widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds." *Id.* at 2, 1986 U.S.C.A.A.N. at 5267. Thus Congress encouraged citizens to come forward with information about fraud against the public treasury and to file *qui tam* actions partly based on the promise of a share of the Government's recovery. 31 U.S.C. § 3730(d)(2006). When the Government reduces the relator's share because a defendant is unable to pay the full measure of damages, the purpose of the FCA is obstructed. For the other side of the coin, if the Court awards Pallares 24% of the $13.2 million that Defendants have agreed to pay to resolve the *qui tam* action, the purpose of the FCA is realized.

Pallares states that, as this Court explained, where there is no public disclosure the only factor for determining a relator's share under § 3730(d)(1) is the degree of the relator's contribution to the case or settlement; in contrast, decisions employing a claim-by-claim analysis have done so when public disclosure has been at issue. She finds that most of the cases

-11-

cited by the DOJ address public disclosure or Rule 9(b) and related
grounds for dismissal of claims.  She argues that where public
disclosure and/or Rule 9(b) defenses are not asserted, there is no
reason to parse out the claims in a settlement.  Furthermore, the
DOJ only now, in response to the Court's recent order and in a new
attempt to minimize Pallares' share, claims that public disclosure
has occurred and Pallares in not an original source for the
trucking fees and inflated invoices that make up $3.2 million of
the parties' putative settlement.  Citing courts' and commentators'
observance of the DOJ's less than magnanimous treatment of its
relators at the end of an investigation, Pallares highlights the
fact that she was not given an opportunity at the hearing to
present evidence regarding public disclosure or original source
issues.

Regardless, regarding the DOJ's "eleventh hour" public
disclosure argument, suddenly raised after five years of
litigation, Pallares maintains that "public disclosure" and
"original source" concepts under the FCA are not relevant here, and
the DOJ's contention that she is a member of the public in learning
about the trucking fraud and invoice inflation from the
investigators is inapposite.  First, she explains, there are only
three fora for public disclosure identified in the statute:  (1) a
"criminal, civil, or administrative hearing"' (2) a "congressional,
administrative, or Government Accounting Office report, hearing,

-12-

audit, or investigation"; or (3) the "news media." §
3730(e)(4)(A). A number of courts have concluded that "information
that was 'disclosed in private'" is not a public disclosure under
the FCA. *See United States ex rel. Schumer v. Hughes Aircraft Co.*,
63 F.3d 1512, 1518 (9th Cir. 1995), *quoting United States ex rel.
Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co.*, 944
F.2d 1149, 1161 (3d Cir. 1991), *vacated on other grounds*, 520 U.S.
939 (1997); *see also United States ex rel. Devlin v. California*, 84
F.3d 358, 360 (9th Cir. 1996)(holding that although a newspaper
article was a public disclosure, a relator's private disclosure to
a reporter in advance of publication was not a public disclosure).
The rule applies even if the private disclosure is made to a
Government employee. *Hughes Aircraft*, 63 F.3d at 1518. In
addition, public disclosure is limited to information that is
actually made public, in contrast to information that is "only
theoretically available upon the public's request." *Id.* at 15, 19-
20, *quoting United States ex rel. Springfield Terminal Ry. Co. v.
Quinn*, 14 F.3d 645, 652-53 (D.C. Cir. 1994). Thus even when the
Government possesses information, it is not publicly disclosed
within the meaning of the FCA until it is actually disclosed to the
public, who are defined as strangers to the fraud. *Id.*

Pallares contends that the Government's reliance on a single,
unpublished case, *St. Edward Mercy Medical Center,* finding there
was public disclosure after relators reviewed subpoenaed records

-13-

and learned of facts from an assistant U.S. attorney and federal investigators, is inapposite here for two reasons:  (1) in that case relators argued that the public disclosure occurred after the original complaint was filed (and the court agreed), but they did not challenge whether the disclosures occurred in a proper forum under the statute, nor whether they were actually "public"; and (2) the sole authority cited by the *St. Edward* court, *Rockwell International*, did not address public disclosure.

Moreover, although Pallares and the agents received information in the course of discovery through a search warrant, the Fourth Circuit has only recognized public disclosure in the form of discovery materials when those materials have been filed with the clerk of the court.[8]  *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 2004)(noting the majority of courts have concluded that "any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in

---

[8] The Court notes that *Siller* addressed only civil actions and held that an entire civil proceeding (action) can constitute a "hearing" within § 3730(e)(4)(A).  21 F.3d at 1350.  The Second, Third, and Eleventh Circuits disagree with the Fourth Circuit and have held that discovery material is "publicly disclosed" in a civil suit even if it is not filed with the court.  *United States ex rel. Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158-59 (2d Cir. 1993); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1157-58 (3d Cir. 1991); and *United States ex rel. Brickman v. Business Loan Express, LLC*, 2007 WL 4553474 (N.D. Ga. 2007), *aff'd*, 310 Fed. Appx. 322 (11th Cir. 2009).

a civil hearing for purposes of section 3730(e)(4)(A)"), *cert. denied*, 513 U.S. 928 (1994). Furthermore, argues Relator, most jurisdictions limit or reject a determination of public disclosure based on discovery materials disclosed within the same *qui tam* case. *See, e.g., Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992)("Evidence publicly disclosed for the first time during the discovery phase of a *qui tam* suit is not barred from use in that same suit by section 3730(e)(4)(A). If it were, *qui tam* plaintiffs would have little choice but to waive their right to discovery for fear of disclosing information that would bar the claims for which they might wish discovery in the first place.").

In this action, in addition to the search warrant, the second potential public disclosure was in the press regarding Samir Itani's criminal indictment. Although a press release can be a public disclosure under some circumstances, the Ninth Circuit has held that no public disclosure can occur when the disclosure stems from an investigation that was caused by the relator's own disclosure to the Government. *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 411 (9th Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994).[9]

---

[9] In *Barajas* two relators brought a *qui tam* action against a defense contractor, Northrop Corporation, for falsification and omission of tests relating to data flight transmitters supplied to the Air Force. The Government intervened in the action and filed an amended complaint adopting the same claims. A couple of months later the Government filed a criminal indictment based on these claims and added a charge of use of improper damping fluid that

caused the transmitters to fail; that indictment became public. Northrop subsequently pled guilty to the fraudulent inspection and testing counts, and the counts charging damping fluid fraud were dismissed.   The civil case alleging fraudulent inspection and testing then settled.   The district court permitted the relators to sever the counts of their original complaint that were not adopted by the Government.   The relators then filed an amended complaint that added the damping fluid fraud allegations.   Northrop filed a motion to dismiss, arguing that the damping fluid claim was barred because it had been publicly disclosed by the Government in the indictment and the relators were not its original source.   The district court granted the motion.

On appeal, the Ninth Circuit remanded the case for the district court to determine whether the information was publicly disclosed and whether Barajas was the original source.

The district court, relying on another district court's opinion and the Ninth Circuit's affirmance in *Wang v. FMC Corp.*, No. C-87-20814-WAI, 1991 WL 537020, 1991 U.S. Dist. LEXIS 6683 (N.D. Cal. Apr. 23, 1991, *aff'd*, 975 F.2d 1412 (9th Cir. 1992), found that Barajas did not qualify as an original source because he did not have sufficient direct and independent knowledge of the use of inadequate damping fluid, and that even if he had, he did not qualify because he had failed to reveal the information to the Government before filing his initial *qui tam* action.

On appeal in *Wang*, the Ninth Circuit had rejected the lower court's ruling that a *qui tam* plaintiff can be an original source only if he provides enough information to state a claim under the Act.   Instead the appellate court opined that § 3730(e)(4)(A) "requires a *qui tam* plaintiff to have *played some part* in his allegation's original public disclosure" and that "*all*  those who 'directly or indirectly' disclose an allegation might qualify as its original source."   5 F.3d at 410 n.7, *citing*  its earlier affirmance of Wang, 975 F.2d at 1418.   (The Fifth Circuit has not adopted this standard for an "original source," and it has been rejected by the majority circuit courts of appeal.   *United States ex rel. Reagan v. East Texas Medical Center Regional Healthcare System*, 274 F. Supp. 2d 824, 851 n.20 (S.D. Tex. 2003)(and cases cited therein), *aff'd*, 384 F.3d 168 (5th Cir. 2004).))   Furthermore in *Barajas*, 5 F.3d at 410, the Ninth Circuit noted that *Wang* reflected the language of the statute, which refers to "*an* original source," suggesting more than one is possible and observing that the statutory percentage accorded as the relator's reward reflects the degree to which the complaint is based on public information and on the relator's independently and directly obtained knowledge, provided to the Government before the public disclosure in the indictment.   It opined that Barajas could be "an original source

In the instant action everyone agrees that Pallares triggered both the civil and the criminal investigations with her initial

---

with respect to a proposed amendment if he played some part, whether direct or indirect, in the public disclosure of the allegations." 5 F.3d at 411. It observed, "The answer to this inquiry depends on the facts and circumstances of the individual case, evaluated in light of the central purpose of the Act to encourage persons with knowledge of fraud against the government to come forward with their knowledge." *Id.* The Ninth Circuit found that the record demonstrated that Barajas voluntarily revealed all the information he had before he filed his *qui tam* complaint and that his knowledge was direct and independent because he gained it while he was employed at Northrop. *Id.* Moreover his knowledge of Northrop's falsification and omission of tests and inspections "played some part" in the public disclosure in the civil complaint and in the indictment. *Id.* Nevertheless, the appellate court noted that the district court did not decide whether Barajas' information played a part in the public disclosure of the damping fluid allegations, and remanded it for that determination. The district court found the damping fluid allegations were based on allegations in Northrop's indictment. Before the Ninth Circuit Barajas then argued that the allegations in the indictment were not "publicly disclosed." *Id.* In affirming *Wang*, the Ninth Circuit also stated, "Evidence publicly disclosed for the first time during the discovery phase of a *qui tam* suit is not barred from use in that same suit by section 3730(e)(4)(A)." *Id., citing Wang*, 975 F.2d at 1416. Although in *Barajas* the deficiency in the damping fluid was not disclosed during civil discovery, but as a result of the Government's criminal investigation, Barajas argued and the Ninth Circuit agreed not to recognize "a distinction between disclosure resulting from civil discovery by the Government or a qui tam plaintiff, and disclosure resulting from a criminal investigation by the Government based on information provided by a qui tam plaintiff" because it "would allow the Government to limit the potential recovery of qui tam plaintiffs unfairly simply by initiating a criminal investigation, and would subvert Congress's desire to combat fraud by providing broad incentives for qui tam suits." *Id.* at 411. Thus under *Barajas,* a "disclosure resulting from a criminal investigation by the Government based on information provided by a *qui tam* plaintiff" is not treated as publicly disclosed under the statute and does not bar the suit under § 3730(e)(4)(A). *Id.* at 411-12.

disclosures to the Government.   As to her qualification as an original source of the trucking and inflated invoice charges, that requirement is met if the relator has direct and independent knowledge of any essential element of the underlying fraudulent transaction.  *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 657 (D.C. Cir. 1994); *United States ex rel. Ervin & Associates v. Hamilton Securities Group, Inc.*, 370 F. Supp. 2d 18, 40 n.11 (D.D.C. 2005); *United States ex rel. Minnesota Assoc. of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050 (8th Cir. 2002).  Pallares argues that the products for which Defendants falsified expiration dates were the same transactions for which they faked the transportation charges and shelter invoices.  She states that she had direct and independent knowledge regarding these transactions including details surrounding typical transportation arrangements, essential to this fraud and to the investigation, despite the fact that the agents discovered other key facts of which Pallares was unaware.  Thus she qualifies as an original source.

## Court's Decision

Because both parties have raised new arguments, the Court has spent additional time researching and considering the issues under the facts here and accordingly grants the motion to reconsider to re-examine Pallares' claim for her relator's share of the Government's recovery under the putative settlement.

As noted earlier, § 3730(e)(4)(A) states, "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." If a *qui tam* suit was based on such publicly disclosed information, the relator may still proceed if he was the "original source" of the information, i.e., that he has "direct and independent knowledge of the information on which the allegations are based" and voluntarily disclosed that information to the government, if he was to participate in a share of the government's recovery. § 3730(e)(4)(B). If there is no public disclosure under subpart (4)(A), the original source exception does not apply. The statute expressly states that the public disclosure bar is jurisdictional. 31 U.S.C. § 3730(e)(4)(A).

The Court still rejects application here of the claim-by-claim analysis argument put forth by the Department of Justice initially grounded in *Merena*, 205 F.3d 97. In that case, the Third Circuit observed the quirky drafting of the *qui tam* statute, which "is phrased as if every qui tam complaint contained only one claim." *Id.* at 102. Yet a plaintiff may bring multiple claims, each alleging a separate violation of § 3729, and the government is allowed to choose to intervene on less than all of them; moreover

-19-

it may settle or dismiss any or all of the claims.  *Id.*  The "first-to-file" rule of § 3730(b)(5) may also bar some claims; in such cases, "the court must conduct a claim-by-claim analysis in order to determine if section 3730(b)(5) applies."  *Id.*  Regarding the public disclosure bar of § 3730(e)(4), the Third Circuit opined that a plaintiff's joinder of all of his claims in a single action "should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action," nor should the joinder cause dismissal of claims that would otherwise have survived.  *Id.*  In sum the Third Circuit held that "in applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone."  *Id.*  In other words, such an analysis is applicable to determine jurisdiction over each claim.

In *Rockwell International*, 127 S. Ct. 1397, the Supreme Court clarified the "original source exception" in the context of a potential public disclosure bar.  The Supreme Court construed section (e)(4) to mean that "information on which the allegations are based" in subparagraph (B) is the information upon which the relator's allegations are based, and not publicly disclosed allegations.  127 S. Ct. at 1407, 1408.  "Information" in subparts (A) and (B) "are one and the same," i.e., "information underlying

the allegations of the relator's action." *Id.* at 1408.[10]   The
Supreme Court determined that during the course of the litigation
before it, Relator Stone's initial prediction of the nature of the
defect in the pondcrete was proven incorrect, but in the meantime,
he had left his employment at Rockwell and did not know what was
discovered subsequently about the pondcrete, what happened to it
when it was stored, what Rockwell failed to do, and what false
statements Rockwell made to the Government about its storage, i.e.,
he lacked direct and independent knowledge of what the defect was.
Thus the Supreme Court concluded that Stone did not satisfy the
requirements for an "original source."   *Id.* at 1409-10.
Furthermore, central to the claim-by-claim analysis, which applies
when there is a jurisdictional question relating to more than one
claim, the high court opined, "Section 3730(e)(4) does not permit
jurisdiction in gross just because a relator is an original source
with respect to some claim." *Id.* at 1410, *citing Merena*, 205 F.3d
at 102 (a *qui tam* relator whose claim was based on publicly
disclosed information was not entitled to share in the government's
proceeds based on that claim); *Hays v. Hoffman*, 325 F.3d 982, 990
(8th Cir. 2003); *Wang ex rel. United States v.* FMC Corp., 975 F.2d
1412, 1415-16 (9th Cir. 1992).

    For the public disclosure bar, a disclosure is "public"

---

        [10]    Furthermore the word, "allegations," relates not only to
the original complaint, but to any amended complaint, and where it
exists, a superseding pretrial order.   *Id.* at 1408-09.

if it is generally available to the public. *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1185 (10th Cir. 2008)("[W]e interpret 'public disclosure' to require release of information such that it is generally available and not subject to obligations of confidentiality."); *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)(defining "public" in "public disclosure" as "accessible to or shared by all members of the community"); *see also Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004)(noting that the public disclosure requirement "clearly contemplates that the information be in the public domain, in some capacity"); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991)("We read section 3730(e)(4) as designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.").

*United States ex rel. Poteet v. Bahler Medical, Inc.*, __ F.3d __, No. 09-1728,4 (1st Cir. Sept. 8, 2010).

Furthermore a public disclosure must emanate from one of the sources specifically enumerated in § 3730(e)(4)(A), i.e., (1) a "criminal, civil, or administrative hearing"' (2) a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation"; or (3) the "news media."  "Hearing" is synonymous with "proceeding" and is not limited to a formal proceeding, but can refer to informal, "paper" hearings. *See, e.g., Poteet*, 2010 WL 3491159, *7, *citing United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co. of America*, 944 F.2d 1149, 1155 (3d Cir. 1991), and *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d, 645, 652 (D.C.

-22-

Cir. 1994).

In *Rockwell International*, the parties agreed that the fraud allegations involved were publically disclosed before the relator filed the *qui tam* action on behalf of the Government, thus triggering the requirement that the relator demonstrate that he was the "original source'" of the information or have his claim(s) barred.  In the instant action, until the DOJ filed its pending motion to reconsider, the parties had agreed that there was no public disclosure of any of the claims involved, and thus no jurisdictional bar.  Relator's counsel continues to argue such.  In contrast the Government now argues that the trucking and invoice claims were disclosed by its agents to Pallares and she was not an original source with independent knowledge of those two fraud counts.   Thus, for purposes of the instant motion, the threshold questions are whether the information underlying trucking and invoice  allegations was publicly disclosed, and whether Pallares was a member of the public to whom they were disclosed;[11] if so, and if she had pled them in an amended *qui tam* complaint,[12] the claims would be subject to a claim-by-claim analysis, and for them to survive, Pallares would have to show that she had direct and

_____

[11] The issue may be broadened to encompass any jurisdictional bar, but public disclosure is the only one possible under the facts alleged here.

[12] Pallares did not plead the trucking or shelter invoice claims in her *qui tam* suit.

independent knowledge of them and voluntarily disclosed that to the Government.  Only if there was public disclosure, however, does the issue of whether she was an original source of the information on the trucking and invoice claims arise.  If there is no public disclosure bar (or other jurisdictional bar, but none has been alleged here), a claim-by-claim analysis does not apply.

As noted, public disclosure of allegations or transactions may only come from the sources enumerated in § 3730(e)(4)(A), "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."  Under the facts here, the statutory forum for public disclosure allegedly involved here is the indictment as a "criminal hearing."  The Ninth Circuit has concluded that an indictment can be a "public disclosure" that triggers the public disclosure bar where the *qui tam* suit with the same claims is filed after the indictment.  *United States v. Reagan v. Marovic*, 242 F.3d 385 (Table), No. 99-15847, 2000 WL 1529236 (9th Cir. Oct. 16, 2000).  In the instant case, however, the fraud allegations were not based on the indictment, but vice versa:  the allegations in the indictment were based on private disclosures between the Relator and the government during investigation, arising out of the Relator's still-sealed civil *qui tam* suit and during which she explained to the Government, based on her direct knowledge of the business from employment at American Grocers from

-24-

1996-2003, the significance of documents recovered during the warranted search.[13] She was clearly not a member of the public nor did she rely on public disclosure with regard to any of the three claims.  Nor were the claims disclosed to the public before the indictment was filed.

Furthermore the Fifth Circuit has defined "direct knowledge" for purposes of an "original source"  as knowledge "obtained first hand, by the relator's own efforts rather than by the labor of others, and not derivative of the information of others." *United States ex rel. Lam v. Tenet Healthcare Corp.*, 287 Fed. Appx. 396, 400 (5th Cir. 2008), *citing United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003), *abrogated on other grounds by Rockwell Int'l*, 549 U.S. 457. "Independent" knowledge "cannot rely on any public disclosures. *Id., citing id.* Furthermore, "Relators found to have direct and independent knowledge are those who actually viewed source documents or viewed first hand the fraudulent activity that is the basis for their qui tam suit." *Id.* Because Pallares produced the information underlying the Government's indictment counts by reviewing first hand the documents obtained in the search and explaining their significance to the Government, the Court finds that her knowledge was direct and independent.  Even had there been

---

[13] Nor was her knowledge based on news media articles published after the indictment was filed.

public disclosure of the documents before she provided her
interpretation to the Government, she would still have qualified as
an original source.  As noted, there can be more than one original
source under the express language of § 3730(e)(4), as long as the
second in not barred by the first-to-file rule.  As it is, the
issue of original source does not come into play because the public
disclosure of the information underlying the trucking and invoice
claims only occurred when the indictment was filed.  Pallares did
not learn of the fraud from its public disclosure in the
indictment.  Nor did she learn about it from the Government agents,
although they did provide her with the documents; rather *they
depended upon her* during discovery to construe and interpret from
her personal knowledge gained directly and independently during her
seven-year employment at American Grocers the significance of
documents recovered through the search warrant, which was also
executed because of information that she provided regarding the
expired/altered dating of the food products and forged
documentation relating to it.  She is not a parasite seeking a free
ride on information previously obtained by the Government, but at
minimum an equal partner, and probably more, in developing the
claims against Defendants for the Government's indictment.  Her
role went far beyond filing a *qui tam* action that instigated the
government's investigation.  *See* #79 at 19-21.  Because there was
no public disclosure until the indictment was handed down and

-26-

because she never amended to add to her single expired/altered date claim the other two trucking and invoice claims to her *qui tam* action, there is no jurisdictional issue here that would require a claim-by-claim analysis.

Thus the issue before this Court is on what basis should it determine the appropriate amount of Relator Pallares's share under § 3730(d). A number of significant factors make that determination difficult here. As noted in the Court's previous Opinion and Order, the Government, claiming that it did not want to bankrupt Defendants, settled this suit for far less than its actual or estimated value and for far less than is customary in FCA actions; in the process it arbitrarily limited Relator's expired/altered-date claim to a proposed 20% of $10 million[14] (in part by taking the settlement amounts for the trucking and shelter invoice claims off the top), even though it allowed the Itanis, who own additional properties, to continue to live in an expensive home in the Memorial section of Houston and to continue in business despite the extensive fraud to which they had pled guilty. The DOJ's attorney did not respond to these criticisms nor present any evidence that Defendants were unable to pay more. Furthermore, appreciative of Pallares's substantial assistance in the investigation and prosecution of Defendants, Assistant United States Attorney

---

[14] The Government claims that $10 million is the amount of the settlement attributable to the expired/altered-date claim.

Michelle Zingaro and agents from the Defense Criminal Investigative Service working for the Government in its investigation recommended that Pallares receive 24% of the entire $13.2 million settlement.

Furthermore, the policy reasons behind the FCA support a larger award than a percentage of the questionably reduced $8.2 million settlement for the expired/altered-date claim.  In 1986 Congress significantly amended the FCA by increasing incentives for potential relators to come forward to expose fraud and enforce the statute, including increasing the relators' share of the government's recovery, lowering the intent requirement from specific intent to defraud to acting with "deliberate ignorance" or reckless disregard of the truth or falsity" of the information provided by the relator to the government, and permitting relators to base claims upon already publicly disclosed information as long as the relator was an "original source" of the information.   31 U.S.C. § 3730(d)(1).  According to the legislative history, Congress's "'overall intent in amending § 3730 [was] to encourage more private enforcement suits.'"  *Bledsoe I*, 342 F.3d at 648, *citing* the Senate Report 99-345 at 23-24, 1986 U.S.C.A.A.N. at 5267.  As noted it recognized that "'[i]n the face of sophisticated and  widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease the wave of defrauding public funds."  *Id.*, *citing id.* at 2, 1986 U.S.C.A.A.N. at 5267.  Moreover, as the Court observed in #79 at 32,

-28-

The legislative history provides some insight.  The House version of what became § 3730(d)(1) stated in relevant part:

In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above 15% and up to 25%.

132 Cong. Rec. H9382-03 (Oct. 7, 1986)(Westlaw ed.)(statement of Rep. Berman).  The Senate version of the bill lists the following factors for a court to review in determining the relator's award:

(1) The significance of the information provided to the government by the qui tam plaintiff;

(2) The contribution of the qui tam plaintiff to the result; and

(3) Whether the information in the suit provided by the relator was previously known to the government.

S. Rep. No. 99-345, at 28 (1986), reprinted in 1986 U.S.C.A.A.N. 5266, 5293.  *See, e.g., Quorum Health*, 171 F. Supp. 2d at 1332-33 (applying House and Senate factors to give relator a "robust" award).

As the Court discussed, no court has followed the conclusion in *United States v. Bisig*, No. 100CV335JDTWTL *et al.*, 2005 WL 3532554 (S.D. Ind. Dec. 21, 2005) that a criminal forfeiture action between the Government and a Defendant is an "alternate remedy"[15]

---

[15] Section 3730(c)(5) of the FCA states clearly, "The Government may elect to pursue its claim through any alternate remedy available to the Government. . . . If such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." It further provides that "alternative remed[ies] . . . include any administrative proceeding to determine a civil money penalty," but

to a *qui tam* action when it arises out of the same fraud and when the Government has not intervened in the *qui tam* action but sought recovery of the defendant's assets through criminal forfeiture.[16] The alternate remedy provision, § 3730(c)(5, does not explicitly state that it applies to criminal proceedings, as it does to administrative proceedings.   Here the Government seeks to accomplish essentially the same end as it did in *Bisig*, not through a criminal forfeiture action, but by initiating a criminal case, obtaining a plea, and entering into a settlement agreement. Nevertheless, as Relator's counsel observes, *Bisig* did pay heed to the policy behind the enactment of the FCA of encouraging private enforcement of the statute and preventing the government from circumventing having to share the recovery with a deserving *qui tam* relator.   That concern about the government reducing or precluding the relators from their share of recovery is echoed by Claire M.

---

does not mention criminal proceedings.

[16] *Bisig* limited its holding by stating that "the relator's right to participate as a party in the alternate proceeding only extends to the forfeiture proceeding, not to the entire criminal prosecution."   *Id.* at *6.

The only other case found by this Court addressing the question is *United States v. Lustman*, Crim. No. 05-40082-GPM, 2006 WL 1207145 (S.D. Ill. May 4, 2006), in which the Relators in a *qui tam* suit, in which the Government had not intervened, sought to intervene in the criminal case.   The court concluded that the criminal prosecution was not an "alternate remedy" because § 3730(c)(5) assumes that the original *qui tam* suit ended, and it had not in *Lustman*.   *Id.* at *2, *citing Bledsoe I*, 3342 F.3d at 647.   It stated that *Bisig* was thus distinguishable from the facts before it *and* had "no precedential value."   *Id.* at *3.

Sylvia in The False Claims Act:  Fraud Against the Government, §

11:86 ("Alternate remedy:   31 U.S.C. § 3730(c)(5)--Criminal

Proceedings")(Database Updated April 2010):

> Whether a criminal proceeding is an "alternate remedy" to a civil false claims act case is undecided. On the other hand, a criminal proceeding is for purposes of punishment and is not typically considered a "remedy" available to the Government.  Because of the procedural protections afforded criminal defendants, it would be unlikely that a relator could participate in a criminal proceeding and exercise the "same rights in such proceeding" as the relator would have had in pursuing the civil qui tam action.  On the other hand, while criminal proceedings are aimed at punishment, they can include a remedy in the form of restitution.   In addition, the relator's rights are not limited to rights of participation (which can under the statute be restricted even in a civil qui tam action) and include rights to share in the proceeds.  If a criminal proceeding is not considered an alternate remedy, the Government could effectively attempt to cut the relator out of a case that the relator brought to the Government.

To a substantial degree, the Government has in effect

attempted to reduce the amount of the recovery share which

Pallares, in this Court's discretion, should have had for her *qui*

*tam* action (1) through a criminal action in which she cannot

intervene and outside of her civil *qui tam* action by pursuing her

expired/altered-date claim and others developed only because of her

participation and contributions, (2) by limiting the amount of the

settlement of the Relator's single claim to significantly less than

its value, unilaterally, after questionably concluding that

Defendants could not have paid more, and (3) by prioritizing the

three claims brought by the Government so as to remove the amount

for the other two off the top.  The alternate remedy provision was enacted to protect the relator where the Government, in essence, takes advantage of loopholes in the statute to unfairly limit or bar the relator's share in the Government's recovery, but its unclear parameters make uncertain the nature of the proceedings it may reach.  Pallares does have a valid *qui tam* complaint under § 3729, asserting her expired/altered date claim.  *United States ex rel. Adrian v. Regents of University of Calif.*, 337 Fed. Appx. 379 (5th Cir. 2009)(to share in proceeds of an alternate remedy the relator's *qui tam* action must be valid under § 3729).  In light of the clear intention of the 1986 amendments to encourage private enforcement, in light of the statute's express concern that the government not be able to reduce or avoid allowing the relator a share of the recovery which the court in its discretion determines appropriate, by pursuing an alternate remedy, in light of the government's settlement of the entire criminal action for far less than the value of the expired/altered date claim despite evidence of Defendants' wealth, this Court concludes that the appropriate standard for determining Pallares's share is found under the relevant portion of § 3730(d)(1)("If the Government proceeds with an action brought by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, *depending upon the extent to which the person substantially*

*contributed to the prosecution of the action.*" [emphasis added by the Court). Although technically the Government has not intervened in Pallares's *qui tam* suit, it has taken those allegations and added claims relating to the trucking and sheltered invoices, developed substantially because of her civil suit and active participation in the government's investigation, brought criminal proceedings against Defendants, and settled with Defendants outside the *qui tam* action. In essence, the effect is the same as if the Government had intervened, taken control of the *qui tam* suit, and settled the case. Thus the only factor identified in the FCA to determine the Relator's appropriate percentage of the recovery over fifteen percent is "the extent to which the person substantially contributed to the prosecution of the action."   31 U.S.C. § 3730(d)(1). The degree of Pallares's contribution to the case or settlement was discussed by this Court, applying the Senate Factors and the DOJ internal guidelines, in its earlier Opinion and Order (#79 at 6-13, 21-23). Moreover, because Pallares's single claim was valued at far more than the entire amount of the settlement of all the Government's claims,[17] the Court finds under the circumstances here that she is entitled to 24% of the $13.2

---

[17] The DOJ has admitted that the value of the expired food sales is at least $16.5 million. Mr. Androphy represented to the Court that the Government usually settles with Defendants in FCA cases for two times the amount of actual damages; even if one uses the $8.25 million the government allotted to the food claim, a customary settlement would amount to $16.5.

million.

Accordingly, for the reasons stated above, the Court

ORDERS that the motion for reconsideration is GRANTED (#80), but, having reviewed the arguments in the parties' briefs, the Court DENIES the Government relief as indicated above.

**SIGNED** at Houston, Texas, this 3ʳᵈ day of November , 2010.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE